BESSIE MAE HUMBERT, Adm'r of the Estate of Marvin Humbert, Deceased, Plaintiff-Appellant, v. PALUMBO EXCAVATING COMPANY, INC., Defendant-Appellee (Becor-Western, Inc., Third-Party Plaintiff; Leininger Mid-States Paving Company, Inc., Third-Party Defendant).

First District (1st Division)   No. 1—91—3888

Opinion filed April 12, 1993.—Rehearing denied November 17, 1993.

Bruce A. Dickman, Robert Carrillo, and Edward T. Graney, all of Chicago, for appellant.

Landau, Omahana & Kopka, Ltd., of Chicago (Jeffrey S. Herden, Timothy M. Palumbo, and Gene A. Pinkus, of counsel), for appellee.

PRESIDING JUSTICE MANNING delivered the opinion of the court:

This is an appeal by plaintiff, as administrator of the estate of decedent, from a judgment of the trial court granting summary judgment in favor of defendant. Plaintiff brought a four-count complaint against defendant Palumbo Excavating Company seeking to recover damages for the death of decedent, Marvin Lamont Humbert. Plaintiff's complaint alleged specific acts of negligence and violation of the Illinois Structural Work Act (Ill. Rev. Stat. 1987, ch. 48, pars. 60 through 69). Summary judgment was granted in favor of defendant as to the Structural Work Act claim, and after plaintiff's unsuccessful motion for reconsideration, this appeal followed.

The record reveals that on June 21, 1986, decedent was employed by Leininger Mid-State Paving Company to work on a construction job on the I-290 expressway project in Chicago, Illinois. Decedent worked with Filippo Sgaramella and Daryl Turner on the project. Sgaramella testified in deposition that on the day of the incident he was assigned the task of taking the boom apart and enlisted Turner and decedent to furnish the tools to help him. He stated that dece-

dent's responsibility was also to drive the crane in order that it be moved to the set-up site to be dismantled for transport. Sgaramella and decedent drove the crane about one-half mile to the crushing site.

Sgaramella testified in deposition that once at the site he directed decedent to park the crane, then Sgaramella lowered the boom to the ground to begin work on it. Sgaramella stated that it was necessary to use a "cherry picker" to pick up and hold the boom so that it could be dismantled. He left to get a "cherry picker," and he testified that before leaving, he instructed decedent and Turner not to touch the crane. Sgaramella stated that decedent wanted to take the boom apart by removing the cotter pins from the middle of the boom section, and he told Sgaramella that he had dismantled the boom on a prior occasion.

Sgaramella explained that in order to remove the entire boom, it had to be lowered on a trailer. The procedure is required to be done by an operator. When only a section of the boom is to be removed or added to lengthen or shorten the boom, it is placed on wooden blocks or machines are used to hold the boom in place. Sgaramella stated that on the day of the incident a section of the boom was being removed to shorten the boom. He explained that the procedure used to remove the boom required that the middle section of the boom's three component parts be detached by removing the cotter keys and pins that hold it in place. This is done after first using the "cherry picker" and chains to secure the middle section from collapsing. The next step would be to remove the four pins and cotter keys that hold the boom parts together.

Sgaramella stated that after he returned with the "cherry picker," decedent was crushed under the boom in a sitting position. He testified that he did not see the accident happen, but explained that the accident would not have occurred had the boom been secured with the "cherry picker." Sgaramella stated that the pins which hold the boom sections together are located at eye level, about five feet high, and that a person would have to stand on the ground in order to take pins out of the boom. He explained that the normal procedure in removing the boom is that the cotter pin or key is removed and the regular pin is removed afterwards. Sgaramella stated that one cannot be under the boom and take the pins out because it would collapse if not first secured.

Joseph Palumbo, president of defendant company, testified in deposition that decedent was familiar with the assembly and disassembly of the crane. He explained that he and decedent had worked on numerous road construction projects. He stated that the project

that they worked on in June 1986 was the I-290 project. Palumbo testified that the accident occurred at the crushing site, a location where asphalt was crushed for use in the road project, and also where equipment and concrete were stored. Palumbo testified that the construction project area and the crushing site were geographically adjacent so one could walk from one location to the other.

Palumbo testified that the correct procedure to remove the middle section of the boom is to remove the top pins first and then the bottom pins. Palumbo stated that the crane used on the I-290 project was ordered to be disassembled in order to be transported to another jobsite. He testified that there were two pins for the top and two pins for the bottom of the crane, and that after the accident, he saw that both of the bottom pins had been removed and both of the top pins were still in place. Palumbo testified that removing the bottom pins first is improper because there would be no support for the boom once the pins were removed. Usually a person has to stand on the ground in order to remove the bottom pins.

Daryl Turner testified that on June 21, 1986, he worked for Leininger at the I-290 jobsite and recalled that he had been responsible for taking a crane to the crushing site to remove a section of the boom. He stated that the section to be removed was the middle section, which was connected by four pins. The pins extended through the boom and were held by cotter keys or pins. He testified that there were two pins at the top of the boom and two at the bottom. He explained that to remove the middle section of the boom, first the cotter keys had to be removed with a hammer and then the pins are removed by using a very large hammer. Turner testified that it was not necessary for one to be inside the boom in order to knock the pins out because the pins could be knocked out from outside the boom. Turner testified that he and decedent were advised by Sgaramella that to take the boom apart required that a "cherry picker" be used for support. Turner stated that after Sgaramella left, decedent went over to the boom and started to remove the cotter keys. Decedent did not get inside the crane, he remained outside. Decedent was underneath the boom structure when it fell on him.

Turner stated that when the boom that they were responsible for removing fell on decedent, it was above decedent's head. Decedent was actually squatting under the boom and had removed cotter keys by using a hammer and pliers. Turner testified that the top pins were still in place after the accident. Turner stated that decedent had apparently removed one of the lower pins and then attempted to, or did, knock out the other lower pin. Turner based this assumption on the

fact that he recalled hearing the hammer hit the pin just before the boom fell. When Turner reached decedent the upper pins were still in the crane. Turner stated that Sgaramella returned with a "cherry picker" after the incident and lifted the boom off decedent.

Defendant moved for summary judgment, and its motion was granted. Plaintiff argues on appeal that the trial court erred in granting defendant's motion for summary judgment. Specifically, plaintiff contends that the trial court misconstrued the facts in the instant case and misapplied case law in determining that the activity that decedent was engaged in at the time of his death was not covered under the Structural Work Act.

Defendant argues that plaintiff failed to state a cause of action under the Structural Work Act by failing to meet two elements necessary to state a claim. Defendant maintains that at the time of the accident, decedent was not involved in an extrahazardous activity and that the crane was not being used as a support or structure.

Summary judgment is appropriate where the pleadings, depositions and affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. (*American National Bank & Trust Co. v. National Advertising Co.* (1992), 149 Ill. 2d 14, 594 N.E.2d 313.) Because of the extreme nature of summary judgment, a court must exercise extraordinary diligence in its review of the record so as not to preempt a party's right to trial by jury or its right to fully present the factual basis for its claim. (*O'Brien v. Rogers* (1990), 198 Ill. App. 3d 341, 555 N.E.2d 1005.) The court must construe the pleadings, depositions and affidavits most strictly against the moving party and most liberally in favor of the opponent. *Wysocki v. Bedrosian* (1984), 124 Ill. App. 3d 158, 463 N.E.2d 1339.

Here, based on the deposition testimony of Sgaramella, Palumbo and Turner, the crane involved in the accident had been removed from the site where the construction work was being performed to a location about one-half mile away. The purpose of the relocation was to dismantle the crane so that it could be transported to the next jobsite. The crane was not operational, and at the time of the accident, decedent was standing on the ground. However, the Structural Work Act was enacted to provide protection to workers engaged in extrahazardous work. (*St. John v. R.R. Donnelley & Sons Co.* (1973), 54 Ill. 2d 271, 296 N.E.2d 740.) Section 1 of the Act requires:

> "All scaffolds, hoists, cranes, stays, ladders, supports, or other mechanical contrivances, erected or constructed by any person, firm or corporation in this State for the use in the erec-

tion, repairing, alteration, removal or painting of any house, building, bridge, viaduct, or other structure, shall be erected and constructed, in a safe, suitable and proper manner, and shall be so erected and constructed, placed and operated as to give proper and adequate protection to the life and limb of any person or persons employed or engaged thereon, or passing under or by the same, and in such manner as to prevent the falling of any material that may be used or deposited thereon." Ill. Rev. Stat. 1987, ch. 48, par. 60.

■ Although the Act should be liberally construed in order to effectuate its intended purpose, the Act is not designed to govern all injuries that may occur at a construction site. (*Dubrovich v. Commonwealth Edison Co.* (1991), 209 Ill. App. 3d 498, 568 N.E.2d 285.) Rather, the Act should be interpreted in order to provide protection to those injured at a construction site because of the particular hazards associated with the uses of scaffolds and other similar types of support devices to perform one of the specific activities enumerated in the Act, or structural work activities. (*Lafata v. Village of Lisle* (1990), 137 Ill. 2d 347, 561 N.E.2d 38.) The Structural Work Act, by its terms, requires that the injury involve the use of a scaffold, hoist, crane, stay, ladder, support or other mechanical contrivance before the provisions of the Act apply. (Ill. Rev. Stat. 1987, ch. 48, par. 60.) In analyzing whether a device is covered under the Structural Work Act, a court should look past the mere elevation of the worker or material and consider whether the hazard created by the elevation was one the Act was designed to prevent. *Vuletich v. United States Steel Corp.* (1987), 117 Ill. 2d 417, 512 N.E.2d 1223.

In *Prange v. Kamar Construction Corp.* (1982), 109 Ill. App. 3d 1125, 441 N.E.2d 889, the appellate court concluded that the Structural Work Act applied to an injury sustained by the driver of a tractor equipped with a forklift while the tractor was transporting several poles used in the construction of a pole barn from a storage area to their place of installation. The plaintiff was injured when several poles slid from the forklift onto the operator's compartment while he was raising the forklift device. The Illinois Supreme Court analyzed the facts in *Prange* when it decided the case of *Lafata v. Village of Lisle* (1990), 137 Ill. 2d 347, 561 N.E.2d 38. The court concluded that the transport of the poles in *Prange* was considered an activity sufficiently unique to the construction industry, such that the activity was of a particularly hazardous nature and one that the General Assembly was attempting to alleviate when it passed the Structural Work Act. *Lafata*, 137 Ill. 2d at 357.

Similarly, in *Miller v. Clark Wood Construction Co.* (1986), 151 Ill. App. 3d 723, 502 N.E.2d 1061, the appellate court reversed and remanded a judgment of the trial court granting summary judgment in favor of defendant. In that case, plaintiff was injured when he walked under the boom section of a crane that was being dismantled and loaded unto a truck for transport. The crane had earlier been utilized in lifting steel joists in the construction of a library building, but at the time of plaintiff's injury the crane had been moved to a parking lot adjacent to the work site. The trial court granted summary judgment because the crane was not engaged in the erection, repair, alteration, or removal of the building project at the time of the accident.

In relying on *McNellis v. Combustion Engineering, Inc.* (1973), 13 Ill. App. 3d 733, 301 N.E.2d 96, the appellate court held that, as a matter of law, it could not conclude that the activity in which plaintiff was arguably engaged at the time of his injury was not that kind of hazardous construction activity within the purview of the Structural Work Act. The court stated that plaintiff was in fact injured in the dismantling of the boom and that the dismantling of the boom was a necessary component of the use of the crane in erection of the library. In *McNellis*, a workman was fatally injured while removing large, 20,000-pound pedestals from a railroad car located one-half mile from the construction site of Commonwealth Edison's power generating plant. The pedestals were eventually to be installed in the plant as part of the steam generating units. Cranes were available to assist in unloading the pedestals but were not used. The workman was assisting in cutting loose the metal plates that secured the pedestals to a car when one of the pedestals fell, pinning him to the car. The crane could have been used to hold the pedestals in place. The court concluded that the workman was engaged in a hazardous activity in removing the heavy, axial pedestals from the railroad car.

■■ We find these cases persuasive in determining that the activity in which plaintiff here was involved was a hazardous activity and one which the the Structural Work Act intended to cover.

Defendant cites to *Cooley v. Central Illinois Public Service Co.* (1982), 110 Ill. App. 3d 685, 442 N.E.2d 1330, for the proposition that where plaintiff's injury is not the result of a functional or operational defect of the crane, then plaintiff's injury is not covered under the Structural Work Act. In *Cooley*, plaintiff, an operating engineer, was injured when he slipped and fell while attempting to enter into the cab of a crane which he was repairing. The crane was at the construction site and had been temporarily out of service. In ruling that plain-

tiff's injuries did not fall under the purview of the Act, the court stated:

> "While the word 'crane' does appear in the Structural Work Act, *** neither the use of the crane, which was out of service for repairs, nor the activity or 'work' in which plaintiff was engaged at the time of the injury, entering the cab, can be fairly said to be structural work covered by the Act." *Cooley*, 110 Ill. App. 3d at 692.

In reviewing *Cooley*, we find that case distinguishable from the instant case. In *Cooley*, the appellate court found determinative the fact that plaintiff had mud on his shoes and that the mud proximately caused his injury as he attempted to climb into the crane. Here, unlike in *Cooley*, the plaintiff was involved in the disassembly of a truck crane boom that had been used in a construction activity and was being transported for use on another project. As the court in *Miller* found, we also find that the disassembly of the crane was a unique construction activity and involved extrahazardous activity intended to be covered by the Act. Disassembly is an integral activity of the construction process, and because the crane was being moved from one jobsite to prepare it for transport to another, *Cooley* is not binding.

The trial court in the instant case found the facts in *Miller* readily distinguishable. This distinction was based on the fact that the crane here had been removed from the jobsite where it had previously been used, and that the boom was not required to be removed before transport to another site. The crane was not being dismantled so that it could be transported. That distinction appears to be the determining factor as to whether or not the dismantling was an integral part of the construction activity. The trial court here explained that the dismantling of the crane in *Miller* was on site, and in the instant case, it was moved "off site," therefore distinguishing *Miller* from the instant case.

The court's distinction here deals only with the time and location of when the activity occurred and not the hazardous activity itself. It would stand to reason that had decedent simply been engaged in the activity while at the immediate work site then his activity would be covered. The facts here tell us that the crane had been transported to the crushing ground to be dismantled for transport. The crushing grounds were only one-half mile away, and the crane would be transported to another work site after being disassembled. In reviewing *Miller, Prange, McNellis* and the Structural Work Act itself, it is clear that activities here related to the disassembly of a crane used in a construction project which involved a unique hazardous activity. The

Structural Work Act is to be given a liberal construction in achieving its purpose of preventing injuries to persons employed in the dangerous and extrahazardous occupation of construction.

Summary judgment should not be granted unless the right of the moving party is clear and free from doubt. Here, there is a genuine issue of material fact as to whether defendant was engaged in a hazardous activity at the time of his injury. Therefore, the trial court erred in granting summary judgment in favor of defendants.

Accordingly, the judgment of the circuit court of Cook County is reversed and the cause remanded.

Reversed and remanded.

CAMPBELL and BUCKLEY, JJ., concur.